MORGAN *v.* BUFFINGTON, Auditor of Public Accounts.

1. A certificate, signed by the speaker of the house of representatives, and attested by the chief clerk, under the " act to fix the pay of the general assembly and their officers," approved February 20, 1835, (R. C. 1845, p. 713,) is not conclusive upon the auditor of public accounts. He can inquire into the truth of the facts, or contest the legality of the conclusion, stated by the speaker in the certificate granted by him to a member of the house.
2. It is not within the constitutional power of the general assembly to make such a certificate conclusive upon the auditor of public accounts, or restrain the said auditor from an examination of the same, where the act of signing and issuing such certificate involves an infraction of the constitution.
3. A member of the general assembly at the revising session of 1854–5, is not not entitled to a *per diem* allowance during an adjournment of said assembly from March 5th to November 4th, 1855, such adjournment having been made with a view to a dispersion of the members, and their return to their homes, during the intermediate time.

*Application for a Mandamus.*

This is an application to the Supreme Court by John E. Morgan, a member of the house of representatives, of the eighteenth general assembly, for a *mandamus*, directed to the auditor of public accounts, requiring him to draw his warrant on the state treasurer for an amount certified by the speaker of the house of representatives, to be due to the said John E. Morgan, as a compensation for services as member of said house. The facts of the case sufficiently appear in the opinion of the court.

It was contended in behalf of the applicant, that the adjournment of the legislature was a mere *recess* to enable a committee to revise the statutes (see joint resolution, App'x, Sess. Act, 1855, p. 713). The legislature was in session during the time for which the claim for pay is made, for the purposes of revision, and was actually engaged in revising the laws through a committee constituted for the purpose. It was absolutely necessary to take a recess, in order that the committee might do the work assigned them.

On behalf of the auditor, (Buffington,) the following authorities were cited: *State* v. *Hinkson*, 7 Mo. 353 ; *Page* v. *Hardin*, 8 B. Mon. 648.

SCOTT, Judge, delivered the opinion of the court.

This case comes to us on an agreed statement, and the parties have submitted that the opinion of the court may be given on the facts as represented in the petition and the accompanying papers, without the formality of a mandamus in the alternative on the auditor.

The application has found us in the midst of a laborious session, and a speedy determination of the question being solicited, we are prevented from going into a lengthy argument in support of the view we entertain in relation to the important question submitted for our determination.

It appears that the petitioner, John E. Morgan, a representative from the county of Bates, was elected a member of the 18th session of the Missouri general assembly. That session began on the 25th day of December, 1854, and continued until the 5th day of March, 1855, when it was adjourned by a joint resolution of the two houses, until the first Monday of November following. The 18th being a revising session, within the contemplation of the amendment to the constitution, adopted during the session of 1848–9, the adjournment was made with the view that the laws might, in the interval, undergo a revision by a committee composed of members of the two houses, who were required to report to the general assembly at the time to which the adjournment was made. The two bodies being again assembled in pursuance to the adjournment, the petitioner obtained from the speaker of the house of representatives, of which he was a member, a certificate clothed with the formalities required by the act of the legislature fixing the pay of the general assembly and their officers, approved February 20th, 1835, to the effect that the sum of $302 was due to him for services as a member of the house of representatives from the

6th of March to the 3d of April, 1855, at three dollars per day, and from April 4th to November, 1855, at one dollar per day, making together the sum of $302, above mentioned.

From the foregoing statement, it will be seen that the question presented for the determination of the court is, whether, under the constitutional amendment adopted at the session of 1848–9, a member of the legislature can claim compensation for services as a member, during an interval between an adjournment and the day to which the general assembly stands adjourned, the adjournment contemplating a dispersion of the members and their returning home to a distant day.

1. Preliminary to the question stated, one has arisen which involves the right or power of the auditor to go behind the certificate of the presiding officer of the house, and inquire into the truth of the facts stated by him. It is maintained that the certificate is conclusive on the auditor ; that it is a sufficient voucher for him for any warrant he may draw upon the faith of it ; that the responsibility of the act rests on the body from which the certificate emanates, and that he stands absolved from all responsibility for conforming to the requirements of the law in allowing the demand.

Since the adoption of the amendment to the constitution, to which reference has been made, there has been no statute carrying into effect its provisions in relation to the pay of the members of the general assembly. That subject has been left to the act fixing the pay of the general assembly and their officers, approved February 20th, 1835, (R. C. 1845, p. 713,) and to the constitutional amendment, as it stands adopted. The act referred to has been regarded as directing the manner in which the compensation is to be obtained from the treasury, whilst the amendment to the constitution is looked to in order to ascertain the *per diem* allowance and the length of time during which the members shall receive three dollars or one dollar a day as a compensation for their services.

Adopting this practice of the government as sanctioned by law, we then have in force the last clause of the 4th section of

the act regulating the pay of the general assembly and their officers, which prescribes that, "upon the presentation of such certificate to the auditor of public accounts, he shall draw his warrant on the treasurer for the amount." The certificate here alluded to is such a one as was presented by the petitioner to the auditor, in the case before us, in which it was certified by the speaker of the house of representatives that he was entitled to the sum of three hundred and two dollars, for services as a member of the house of representatives, from the 6th of March to the 4th of November, 1855. This is the purport of the certificate. Now the fact is, that during the period mentioned in the certificate, the general assembly was dispersed by an adjournment, and the members were at home engaged in their private pursuits.

Under these circumstances, the question recurs, whether the auditor can inquire into the truth of the fact, or contest the legality of the conclusion stated by the speaker in his certificate granted to the petitioner.

The auditor of public accounts is an important officer, entrusted with the management of the revenues of the state. Whilst the treasurer holds the iron or brazen key of the treasury, the auditor holds the legal key, and it is through his instrumentality alone that money can lawfully be drawn from it. The state looks to him as the protector of her treasure. The powers confided to him are necessarily large, and as by his mismanagement the state may at any time be rendered unable to fulfil her pecuniary engagements, so there should be a power in him to prevent such a state of things. No doubt there are cases in which the general assembly may make a voucher conclusive on the auditor, and require him, as a mere instrument of the law, to issue a warrant without any examination into the justice or legality of the claim. Whether the general assembly has, in any case, made a voucher conclusive on the auditor, is a question to be determined by the auditor, subject to the revision of the courts. We see nothing in the act fixing the pay of the members of the general assembly which shows that it was

Morgan *v.* Buffington.

designed to make the voucher of the speaker conclusive on the auditor. Suppose the speaker should, in the form adopted in the present case, issue his certificate to ten thousand men as members of the 18th general assembly, would those certificates be binding on the auditor? If, under the authority of such vouchers, the auditor should issue warrants on the treasury, could he escape the indignation of the community and avoid the punishment due his crime? As some of the ten thousand, in the case supposed, would be members, and really entitled to their pay, how could the auditor distinguish between those who were or were not members, but by hearing evidence, or, which is the same thing, acting on his own knowledge, and distinguish between the real and pretended members? When we contemplate the consequences which may ensue from maintaining that a voucher cannot be examined, and its correctness tested, we see no propriety in investing such instruments with the sanctity claimed for them by the argument. It is for the interest of the state that there should be such a power in the auditor. It is better that an individual should be delayed in the receipt of the compensation due for his services, than that a door should be opened by which the public treasury would be subjected to exactions wholly unwarranted by law. Ours is a government of checks and stays. These are necessary incidents to the freedom of our institutions. They are a part of the price we pay for the liberties we enjoy. When we reflect on the high powers, in relation to the revenue, with which the auditor has been clothed; the responsibility under which he acts; his immediate subjection to the authority of the courts; there is nothing but safety to the state in giving him a right to re-examine vouchers presented as a foundation for warrants on the treasury. Cases may arise in which the misstatement of the fact contained in a voucher arises wholly from a misconception of the law; how reasonable in all such cases that the voucher should be subject to the re-examination of the officer entrusted with the management of the revenue of the state!

2. Thus far we have considered the voucher of the speaker, in

reference alone to the act fixing the pay of the general assembly, passed when the compensation of the members and the duration of the sessions were subjects within the control of ordinary legislation. But in relation to the matter as it stands affected by the constitution at the present day, we are of the opinion that it would not be within the constitutional competency of the general assembly to restrain the auditor from a re-examination of the voucher, with a view to present his determination of the question, whether the act of the officers of the house involved an infraction of the constitution. It is obvious that, if the general assembly possesses the power by law of compelling the auditor to issue his warrant on vouchers framed according to a formula they may prescribe, then there is no way to enforce the observance of the constitutional restraints imposed on the legislature in regard to the length of its sessions and the pay of its members. It is no answer to this objection that the legislature is responsible to the people for its conduct. That may be so, and there may be violations of the constitution by the general assembly which can only be corrected by the people at the polls. But because there may be cases in which that is the only mode of redress, it does not follow that those instances should be multiplied and left without opposition, when an obvious mode of arresting them is at hand. When the constitution is violated by the general assembly and that violation is complete within itself, and requires no aid from the other departments of the government in order to make it effectual, it must stand until the people see proper to remedy it. But where their act cannot be effectuated without the aid of others, and of those, too, who are sworn to support the constitution, a regard for the maintenance of our system of government, resting on written charters, requires that obedience should not be yielded to an enactment which has no sanction in the fundamental law.

3. An amendment to the constitution, adopted during the session of 1848–9, ordains, " that the members of the general assembly shall receive a compensation for their services not to

exceed three dollars per day for the first sixty days, and after that time not to exceed one dollar per day for the remainder of the session, except at a revising session, they may receive a compensation not to exceed three dollars per day for the first one hundred days, and one dollar per day for the remainder of the session." Under this provision, it is maintained that the general assembly may begin its session at the time appointed by law and continue it for sixty or one hundred days, according as it is a revising session or not, or for a shorter time, and then adjourn to a day long distant, the members dispersing and returning home to their usual occupations, and on their re-assembling at the appointed time, they may claim one dollar per day for every day the houses stood adjourned ; or, if they adjourned before the expiration of the sixty or one hundred days, then they would be entitled to three dollars per day for such a period as would make up the sixty or one hundred days, and one dollar a day for the remainder of the time. It is clear that the object of the amendment was to effect a diminution of the public expenditures, by curtailing the sessions of the general assembly. It was supposed that sixty days ordinarily, and one hundred days at a revising session, would be sufficient to mature all laws required by the interests of the state. Not absolutely prohibiting a continuance of the sessions after the periods specified, the compensation of the members was reduced to a sum barely sufficient to defray the expenses of the most economical. The reduction of pay had the effect anticipated. No session, since the adoption of the amendment, has continued more than a day or two beyond the time during which the compensation was three dollars. The object of the constitutional amendment being plain, on what principle can it be evaded, by a dispersion of the members, so soon as their pay is reduced to one dollar a day, and their continuing at home until their compensation, at one dollar, shall amount to a sum sufficient to pay three dollars a day during the time required to complete the business of the session ? That which cannot be done directly is prohibited from being done indirectly. Such a

construction of the amendment to the constitution renders it a dead letter, and places the state, so far as the end to be attained by it is concerned, in the same condition in which she stood before it was adopted. Indeed, by the construction contended for, the state, so far from attaining the object designed by the amendment, may be placed in a worse condition than before, for the adjournment may be prolonged to a day so distant that the compensation, at one dollar a day, may amount to a sum greatly more than sufficient to pay the members three dollars a day for the time necessary to do the business of the session. Thus an amendment to the constitution solemnly adopted, with the design to curtail the expenses of the government, is made to receive an interpretation by which those expenses may be greatly augmented.

The question, so far, has only been viewed in its constitutional bearings ; but when considered as a matter of contract between man and man, or between the state and one of her citizens, there is nothing in the claim to commend it to our sense of justice. Take the words of the amendment and insert them in a contract between private persons, and we are aware of no principle that would warrant a claim for compensation, by the party who had voluntarily abandoned the service of the other, during the time of such abandonment and whilst he was engaged in his own pursuits. A persuasion that the interests of the employer would be promoted by a delay in the execution of the contract, would confer no right to claim for services during the time the performance of the work was delayed. Full compensation for the time employed had been received, and the agreed compensation is offered when the services are resumed. Such would be the considerations that would influence our determination in a question arising on a contract between individuals, and we are advised of no rule that would warrant a different mode of interpretation in a controversy between the state and one of her citizens.

Mandamus refused ; the other judges concurring.